Reiser *versus* The William Tell Saving Fund Association.

*Premiums paid to Building Associations when usurious.—Legislative Construction of Statutes discussed.*

1. The Legislature have no power to direct the judiciary in the interpretation of Acts of Assembly previously passed, or require it to change an interpretation already put upon them. Such a mandate is unconstitutional and void.

2. An arbitrary interpretation by one legislative body of an Act of Assembly passed by their predecessors, is not legal interpretation, but a substitution of the language and meaning of one for the other.

3. An expository Act of Assembly is destitute of retroactive force, because it is an act of judicial power, and is in contravention of the ninth section of the ninth article of the constitution.

4. The Act of 12th April 1859, in relation to Building Associations, declaring that the premiums obtained by them shall not be deemed usurious, is unconstitutional and void, so far as it is expository: and such associations, in suits for loans made previous to the passage of the act, can recover only the amount loaned on their mortgages, with legal interest.

ERROR to the District Court of *Philadelphia*.

This was a *scire facias sur* mortgage by the William Tell Savings Fund Association, against John Reiser, brought August 25th 1860.

The plaintiff was incorporated by the Common Pleas, September 1853, having its place of business in Philadelphia.

The object of the association is the acquisition of property in real estate or land, and the erection of buildings thereon, at such times, and in such a manner, and under such conditions as the association, from time to time, may determine upon. To this end, the holder of each and every share of stock is required to pay one dollar per month to the treasurer, and whenever and as often as the sum of $200 shall be in the hands of the treasurer, it is to be loaned in preference to such stockholder as shall offer the highest premium for the same, but not more than two thousand dollars shall be paid in reference to the premium offered. The stockholder obtaining the loan, must either pay the premium in cash, or have the same deducted from the loan.

By the tenth article of the by-laws, "Each and every stockholder shall be entitled to a loan of $200, for each share of stock he may hold in this association, but never more. This Article 10 shall and must under no pretence whatever be altered, and each share of stock shall remain $200 till paid off."

Reiser became a member, subscribing for eight shares of stock, on which the charter required him to pay monthly one dollar per share; and had he continued to make these payments until the association expired, he would have been entitled to receive from it the sum of two hundred dollars per share; in ten years his monthly payments would have amounted to one hundred and

twenty dollars; interest at the rate of six per cent. on these payments amounts to thirty-six dollars, which, added to his payments, makes one hundred and fifty-six dollars; and would thus have received forty-four dollars in excess of legal interest, which is equivalent to interest at the rate of thirteen and one-third per cent. per annum.

But Reiser preferred the present loan or advance of his eight shares; his aim, in accordance with the charter, being the "acquisition of real estate;" and accordingly he bid the highest premium for the moneys loaned out by the managers, in which moneys he was interested in common with every member of the association, and was entitled to the loan. But as he was the owner of no real ·estate: with the money thus borrowed, he purchased the premises embraced in this mortgage; "Being the same premises which Erhard Beck and wife, by indenture bearing even date herewith, but duly executed and acknowledged immediately before the execution of these presents, and to be herewith recorded, granted, and conveyed unto the said John Reiser, in fee," and mortgaged them to the association to secure the loan.

The sum he was entitled to borrow from the association was sixteen hundred dollars. This sum he applied for, and the same, after deducting the sum of $424 (which was retained by the managers as a premium for the loan), was handed over to him, he executing to the association his bond and mortgage for the sum of $1600. The amount he actually received was only $1176. Reiser then paid money from time to time to the association, down to the 22d February, A. D. 1860, when he declined to pay any more.

The constitution of the association provided that "in case any stockholder who has obtained one or several loans, shall at any time neglect or refuse to pay his monthly dues, interest, or fines during the period of six months, it shall be the duty of the board of directors to take the necessary legal measures without delay, in order to have the mortgages foreclosed, to insist on the restitution of the loan, and to institute legal proceedings for the recovery of the principal, with fines, interest, and costs." This suit was therefore brought by a *scire facias* on the said mortgage.

| | |
|---|---:|
| The amount claimed by the association was (being the full amount on the face of the mortgage), | $1600.00 |
| From which was deducted the value of eight shares as proven, viz. :    .    .    .    .    . | 928.00 |
| Balance (less interest),    .    .    .    .    . | 672.00 |

On the trial, the defendant below offered evidence to show

that at the time the money was borrowed by him from the association, the officers thereof retained as a premium, the sum of $424; the actual amount received by Reiser being only $1176; which offer was rejected by the court below, and the evidence ruled out.

If the offer to show the premiums as made by the plaintiff in error, had been admitted by the court, the statement would have been as follows:—

| | |
|---|---:|
| Amount of the mortgage, . . . . | $1600.00 |
| Deduct premiums, . . . . . . | 424.00 |
| | 1176.00 |
| Deduct also the value of eight shares as proven, | 928.00 |
| Add interest on $248, from the 22d February, A. D. 1860, the day when Reiser ceased to pay, down to day of trial, say nine months, | 248.00 |
| | 11.16 |
| | 259.16 |

The judge who tried the case, by way of charge, directed the jury to render their verdict, according to the statement of the counsel for the plaintiffs below, as follows:—

| | |
|---|---:|
| Amount of mortgage, . . . . . | $1600.00 |
| Value of stock in February 22d 1860, . . | 928.00 |
| Balance, | 672.00 |
| Interest from February 22d 1860 to November 19th 1860, . . . . . . | 30.00 |
| | 702.00 |

There was a verdict and judgment accordingly; whereupon the defendant sued out this writ, averring here that the court below erred in overruling and excluding the offer of the defendant below, to prove, that at the time the money was received by him from the plaintiffs below, and for which the mortgage sued on was given, he, the said defendant, paid, or allowed to the plaintiffs below, the premium of $424.

*H. R. Kneass*, for plaintiff in error, argued that, as the money was borrowed anterior to the Act of April 12th 1859, by which the premiums thus paid were made recoverable in law, this contract, which was usurious, was not affected by it, the statute having no retroactive effect; citing and relying on the opinion of Smyser, P. J., of the Common Pleas of Montgomery

[Reiser *v.* The William Tell Saving Fund Association.]

county, in the case of The Marble Building Association against G. W. Hacker, which was set out at length in his paper-book, and is to be found in the Leg. Int., November 11th 1859.

*Frederick Heyer* and *St. George T. Campbell*, for defendants in error, cited the various Acts of Assembly and of Parliament, passed for the organization and encouraging building societies, viz., the Acts of 1850, 1855, 1859, and the English Statutes of 6 & 7 Wm. 4, c. 32, 10 Geo. 4, c. 56, 4 & 5 and 9 & 10 Vict., from which their more important provisions are taken; as also the following cases, to show that the payment of such premiums were valid as partnership transactions, or like the purchase of an annuity, and not usurious, and that therefore they were entitled to the encouragement and protection of the law: Silver *v.* Barnes, 6 Bing. N. C. 180; *In re* Sherwood Loan Co., 3 Eng. L. & Eq. 152; Seagrave *v.* Pope, 15 Id. 477 (S. C. 1 De G. M. & G. 753); Barbridge *v.* Cotton, 5 De Gex & S. 17, 8 Eng. L. & E. R.; Archer *v.* Harrison, 7 De Gex, McNagh. & G. 404; Fleming *v.* Self, 3 Id. 404; Moseley *v.* Baker, Id. 1032 (S. C. 6 Hare 87); Armitage *v.* Walker, 2 Kay & Johns. (Ch.) 211; Sparrow *v.* Farmer, 26 Beavan 511; Smith *v.* Lloyd, Id. 507; Farmer *v.* Smith, Leg. Int. of April 8th 1859; Fleming *v.* Self, 3 De Gex, NcNagh. & G. 997; Johnson *v.* Trustees of Potomac Building Association, C. C. of the District of Columbia, Leg. Int., December 11th 1857; Gilpin *v.* Enderby, 5 Barnwell & Alderson, 945; Fereday *v.* Horton, 1 Jacobs 144.

2. In support of the proposition that the fine of ten cents for each dollar of monthly dues unpaid, is not an usurious interest upon dues, they cited Roberts *v.* Tremayne, Cro. Jac. 509; Floyer *v.* Edwards, Cowper 113; Wells *v.* Girling, 4 Moore 78, and 1 B. & Bing. 447.

3. If the fines and forfeitures were much greater than they are, it is not the province of the courts to relieve a member from the known consequences of his own voluntary act. The distinction between enforcing a forfeiture, and relieving against a forfeiture, must not be forgotten. In the former case, the court may refuse to interfere; in the latter it will not, except under very special circumstances: Story Eq. 1323–25; Sparks *v.* Liverpool Waterworks, 13 Vesey 433; Eaton *v.* Lyon, 3 Id. 693; Sanders *v.* Pope, 12 Id. 291; Hill *v.* Barclay, 16 Vesey 403; 18 Id. 58; Bracebridge *v.* Buckly, 2 Price 206; Rolf *v.* Harris, Id. 210; Lloyd *v.* Scott, 4 Cranch C. C. Rep. 223. They argued further, under the above authorities,

That the Act of 1850, creating these associations, and authorizing " preference to be given to the members thereof in such manner and under such conditions and regulations as they may have agreed upon, or may mutually agree upon," legalized

the taking of premiums; because that section will admit of no other construction.

That the Act of 1859 is retroactive in its operation; that section eight is so in so many words, and is a binding enactment, unless it violates some principle of law, or some provision of the State or Federal Constitution.

In answer to the objection that the law is void because retroactive, they cited 2 Story on the Constitution, § 1398; 1 Kent Com. 455; Gault's Appeal, 9 Casey 94; Bleakly *v.* The Bank, 17 S. & R. 64; Tate *v.* Stooltzfoos, 16 S. & R. 35; Underwood *v.* Lilly, 10 S. & R. 97; Bambaugh *v.* Bambaugh, 11 S. & R. 192; Hepburn *v.* Coates, 7 Watts 300; Calder *v.* Bull, 3 Dall. 386; Watson *v.* Mercer, 8 Peters 88; Wilkinson *v.* Leland, 2 Id. 627; Foster *v.* Essex Bank, 16 Mass. 245; Locke *v.* Dane, 9 Mass. 360; Oriental Bank *v.* Friese, 18 Maine 109; Townsend *v.* Townsend, 1 Peck, Tenn. 16; Id. 266; State *v.* Bermudez, 12 Louisiana 355; Goshen *v.* Stonington, 4 Conn. 209; Langdon *v.* Strong, 2 Verm. 234; Wilson *v.* Hardesty, 1 Madd. Ch. 66; Satterlee *v.* Matthewson, 2 Peters 413; Jarvis *v.* Jarvis, 3 Edw. 462.

In reply to the argument that the Act of 1859 is unconstitutional and void, because it impairs the obligation of contracts, they argued that it did not, and that the cases of Bedford *v.* Shilling, 4 S. & R. 401; Conch *v.* Jeffries, 4 Burr. 2460; Boom Company *v.* Dodge, 7 Casey 285; Duffield *v.* Smith, 3 S. & R. 540; Gilmore *v.* Shuter, 2 Shower 17; 2 Modern 310; McCabe *v.* Emerson, 6 Harris 111; Chaffee *v.* Michaellis, 7 Casey 282; O'Conner *v.* Warner, 4 W. & S. 227; Greenough *v.* Greenough, 1 Jones Rep.; Snyder *v.* Bull, 5 Harris 55; McCarty *v.* Hoffman, 11 Id. 507; Biddle *v.* Starr, 9 Barr 461; Willard *v.* Harris, 2 Rawle 56; Presb. Cong. *v.* Wallace, 3 Id. 109; Menges *v.* Dentler, 9 Casey 495; Davis *v.* Dawes, 4 W. & S. 401; Lambertson *v.* Hogan, 2 Barr 25; Butler *v.* Palmer, 1 Hill 324; Dash *v.* Vanvleck, 7 Johns. 477; Calder *v.* Bull, 3 Dall. 386; Vanhook *v.* Whitlock, 26 Wend. 43; Jarvis *v.* Jarvis, 3 Edw. 462; Salter *v.* Tobias, 3 Paige 338; Varick *v.* Briggs, 6 Id. 323; Houston *v.* Boyle, 10 Iredell 496; Ashley's Case, 4 Pick. 23; McLeod *v.* Burroughs, 9 Geo. 214; Allen *v.* The Mayor, 9 Id. 286; Elliott *v.* Lyell, 3 Call. 245; Commonwealth *v.* Beauchairmais, Id. 168; Sturgis *v.* Crowningshield, 4 Wheaton 122; Fletcher *v.* Peck, 6 Cranch 187; Charles River Bridge *v.* Warren Bridge, 11 Peters 420; Bronson *v.* Kinzie, 1 Howard 311, were not in point, or were disposed of on other grounds, and that this act was not open to any of the objections sustained by the cases cited, because it validates the agreement of parties; it impairs no contract; it deprives no man of any rights; it pronounces valid and binding, contracts which at common law have been

[Reiser *v.* The William Tell Saving Fund Association.]

pronounced good; it is not obnoxious as "special legislation;" it is an act in vindication of the policy of the state in favour of homesteads and small real estate owners, and has for its precedent numberless confirming acts and remedial and declaratory statutes of Pennsylvania and other states, which have received the sanction of the Supreme Court of Pennsylvania and of the United States; citing Butler *v.* Pennsylvania, 10 Howard 402; Hess *v.* Wests, 4 S. & R. 356; Bleakny *v.* Farmers' and Mchanics' Bank, 12 Id. 64; Underwood *v.* Lilly, 10 Id. 49; Tate *v.* Stooltzfoos, 16 Id. 35; Watson *v.* Mercer, 8 Peters 89; Satterlee *v.* Matthewson, 2 Id. 380; Greenough *v.* Greenough, 1 Jones 496; Hepburn *v.* Curts, 7 Watts 300; People *v.* Livingston, 6 .Wend. 526; Andrews *v.* Russell, 7 Blackf. 474; Grinder & Baugher *v.* Nelson, 9 Gill 299.

3. The same authorities were cited to negative the position that "the law relating to the transaction at the time it is complete, is an inherent part of the case, and must control the decision," as in most of them it was held that retrospective Acts of Assembly controlled the statute law relating to the transaction at the time when it was complete, and also the decisions; for which reasons it was submitted that the Act of 1859 is constitutional and retroactive, governing this and similar cases, where millions of dollars of the earnings of the industrial population are invested and secured by mortgage on real estate.

The opinion of the court was delivered, May 6th 1861, by

LOWRIE, C. J.—This association is of the same character as those which have become known of late as building associations. They are, in truth, only saving fund and loan societies. They have been in the habit of loaning their funds to those who bid the highest premium, at the rate of six per cent. on the nominal amount of the loan, and this court has several times decided that they can recover only the actual amount loaned with the interest thereon: 2 Casey 269; 6 Id. 465.

Since those decisions, the legislature have declared (12th April 1859), that the true intent of the former acts is that the premiums thus obtained "should not be deemed usurious," and that the nominal principal and interest "may be enforced by proceedings on the securities."

Now, surely this is very improvident legislation. It is not possible that the legislature could have examined all the charters of these associations, and all the bonds and mortgages taken by them, and heard all the parties interested in the subject, so as to know how to enact a general rule that would do justice in all the cases that would arise. They must have acted merely on the representations of some of these associations, and on the information furnished by them. It is thus, we regret to think, that

[Reiser *v.* The William Tell Saving Fund Association.]

special legislation is often procured that is injurious to private rights.

Let us look at its operation on this case, and this is one of many. This mortgage is in the prevailing form, and, according to its language, payment of the principal (including the premium), with interest, might be enforced within a year. That is, for $1176 actually loaned, payment might be enforced within one year, of the sum of $1696, yielding an interest of 44 per cent. If payment were required in two years, it would be 26 per cent. per annum; if in three years, 20 per cent.; if in four years, 17 per cent.; if in five years, 15 per cent.; in six years, 14 per ct.; in seven years, 13 per cent.; and in eight years, 12½ per cent.

Such is the character of the hard contracts which the legislature have declared to be valid; and hard indeed they are, if enforced within the first three or four years, as by their tenor they may be. Hard again, from the fact that it is almost always poor and inexperienced men who bind themselves thus. Hard, too—very hard, because no other lenders of money have such favours granted them; and thus the hardship of the law becomes special.

It is quite apparent that the legislature, and perhaps the associations themselves, felt the severity of these contracts; for the fifth section of the Act of 1859 provides for a proportional return of the premium, if payment should be made before the eighth year, which is a very considerable concession in favour of the justice of our previous decisions.

Now the original contract, so far as relates to the premium, was either valid or invalid according to its terms. If it was valid, the legislature could have no authority to impair it by requiring a return of any portion of the premium. If it was void as to that, we do not now see what authority the legislature could have to validate it—or, in other words, create it. The form of the legislation assumes its invalidity, and then undertakes to infuse validity into it on such terms as the legislature deemed just; that is, deducting part of the hardship. We concede that, if the legislature has authority to validate that portion of the contract which is not binding, it had power to do it on its own terms, as against those seeking the validation; that is, it might validate the contract for any part of its claim. Of course *we* could do no better than strike out the part that was invalid; for we could not legislate.

Here, then, is the question raised for our consideration. Had the legislature of 1859 any constitutional authority to direct the judiciary department how it should interpret the Act of 1850 and its supplements, authorizing the incorporation of such associations as this, and to require it to change the interpretation which it had already put upon those acts, and thus change the legal effect of contracts previously made under them?

[Reiser *v.* The William Tell Saving Fund Association.]

We are constrained to answer this question in the negative. And we think that the truth of this answer is demonstrated by the opinion of Judge Smyser, President of the Common Pleas of Montgomery County, in the case of The Marble Building Association *v.* Hoesker, which the plaintiff in error used as his argument. Yet on such a subject, we feel bound to go further, even at the risk of repeating some things he has said, and that we have said before. Truth, to gain admission, must often be pertinacious in repeating itself. " Line upon line,line upon line ; precept upon precept, precept upon precept ; here a little and there a little," are words of wisdom.

Leaving out unnecessary words of the act, it declares that the true intent and meaning of the Act of 1850 is, that this class of associations may, besides legal interest, take premiums on their loans without transgressing the usury laws.

It is therefore, in its very terms, an expository act. It is an interpretation by one legislature, of a statute written by another legislature nine years before ; and therefore an adjudication of the private rights which have arisen under it. And yet the former legislature said nothing like this, and nothing from which this could be inferred. The legislature have certainly no such authority over us as to change the laws of language. If given language does not express a given meaning, they may give us other language that does ; but this will not change the meaning of the former language. In the very nature of language that is impossible. It is with, and by virtue of the new expressions, that we get the new meaning ; and the meaning of the law being the law itself, the law can be no older than the effectual expression of it. We speak, of course, only of statute laws ; for customary or common law must be in actual operation before it can be authoritatively ascertained and expressed.

True, the Act of 1850 authorizes those companies *to give* preferences to their members under such conditions and regulations as they should agree upon ; but such a general clause never can be interpreted to authorize them to make regulations contrary to the law of the land. Such authority has been always interpreted as subject to the proviso that it shall be exercised consistently with general laws. We should violate the plainest principles of interpretation, if we should treat this clause as expressing the law, that, in favour of these associations, the usury laws are abrogated. It expresses no such thing ; and the Act of 1859 cannot change its nature. Arbitrary interpretation is no interpretation at all ; but only the substitution of one man's language and meaning in place of the language and meaning of another. True interpretation is the ascertainment of another's meaning, from *his* expressions, not from our thoughts and wishes.

[Reiser *v.* The William Tell Saving Fund Association.]

We have no expressions in the Act of 1850, to justify the interpretation put upon it by the Act of 1859.

Yet we understand the legislature of 1859 is directing us to adopt this interpretation, and therefore to abandon the interpretation which the judiciary department of the government has declared to be the true one, and to decide according to the Act of 1859, the private rights which have arisen under the Act of 1850. This we cannot do.

The official respect which is due by one department of the government to another, and therefore by the courts to the legislature, is one of the soundest, most conservative, and most necessary sentiments of our social nature—we wish there might be more of it. Yet this sentiment has led this court so far astray that it has sometimes yielded to mere arbitrary legislative interpretation, and has decided causes, not according to law, but according to the direction of the legislature. But this has often been repented of, and been followed by "works meet for repentance:" 1 Jones 495; 5 Harris 55, 162; 11 Id. 507; 7 Casey 285; 9 Id. 495; 4 W. & S. 227; 2 Barr 25.

In O'Conner *v.* Warner, 4 W. & S. 227, it is declared by Chief Justice Gibson, that "a legislative mandate to change the settled interpretation of a statute and uproot titles depending on past adjudications, or a legislative direction to perform a judicial function in a particular way, would be a direct violation of the constitution, which assigns to each organ of the government its exclusive function and a limited sphere of action."

In Lamberton *v.* Hogan, 2 Barr 25, Mr. Justice Rogers declares that "explanatory acts must be construed as operating in future cases alone, except where they are designed to explain a doubtful statute, in which case they deserve, and always will receive, the most respectful attention from the judicial branch of the government."

Again, in Greenough *v.* Greenough, 1 Jones 495, Chief Justice Gibson says, "All *ex post facto* laws are arbitrary, and it is to be regretted that the constitutional prohibition of them has been restricted to laws for penalties and punishments." And, speaking of an explanatory law, he says: "It is destitute of retroactive force, not only because it was an act of judicial power, but because it contravenes the declaration of the ninth section of the ninth article of the Constitution, that 'no person shall be deprived of life, liberty, or property, except by the judgment of his peers, or the law of the land.'"

Here the reference is to our Bill of Rights—the language is copied from Magna Charta—and there "judgment of his peers" is written, "legal judgment of his peers;" but both mean the same thing. "The law of the land" has always been understood

3 WR.—10

[Reiser *v.* The William Tell Saving Fund Association.]

as equivalent to " the due course or process of law ;" 2 Inst. 46, 50.

Let us read the law thus : No person shall be deprived of life, liberty, or property, except by the legal judgment of his peers, or other due course or process of law.   Here, civil and criminal law, rights of property, and of life and liberty, are put in the same class.   Rights of property (and money possessed or owed is property) and rights of life and liberty, have the same guaranty, that they are to be tried by due course of law.   But they have not the same guaranty, if the legislature may direct the court, after civil cases arise, or after contracts or other transactions are complete, how we shall decide about them, or how we shall interpret the law under which they arise ; which it is admitted they can not do in criminal cases.   This section of the Bill of Rights is violated when civil and criminal rights are not both alike tried by due course of law.

The same right, in both respects, is secured by section eleventh, where it is declared that *all* courts (civil and criminal)—" All courts shall be open, and every man, for an injury done him in his lands, goods, person or reputation (for every civil and crimi- nal injury), shall have remedy by the due course of law, and right and justice shall be administered without sale, denial, or delay."   After what we have said in the other section, we need not enlarge upon this.   Justice is as much violated in a civil as in a criminal case, when it is ascertained by a law that was made after it arose.   By the due course of law, every transaction is to be judged by the law that existed when it arose.   We deny jus- tice when we refuse this.   A man's contract is not changed by an alteration of the standard measures made afterwards.   It is by the courts that this justice is to be administered, and by no other functionaries.   In doing it, they must interpret the laws according to the common law of language and interpretation. If they find a law written which does not convey a given mean- ing, they must decide so.   If it be senseless, they cannot apply it at all—it is no law.   A law written for us in Arabic would be nonsense, and could not become law, by the fact that a subse- quent legislature gives us a true or false translation of it.

We must again insist that the making of laws and the applica- tion of them to cases, as they arise, are clearly and essentially different functions, and that one of them is allotted by the con- stitution to the legislature, and the other to the courts : 9 Casey 495.   Chief Justice Gibson expressed this in Greenough *v.* Green- ough, 1 Jones 494 : " Every tyro or sciolist knows that it is the province of the legislature to enact, of the judiciary to expound, and of the executive to enforce."   It is expressed in the Bill of Rights, requiring the courts to administer justice by the due course of law.   It is expressed in the very form of government, as

[Reiser *v.* The William Tell Saving Fund Association.]

organized by the constitution, allotting "the legislative power" to the legislature, and "the judicial power" to the courts. Each has its share exclusively. The functions are as distinct as those of the stomach and the lungs in our body. They are concurrent, and not antagonistic, functions in the same system, and when each functionary does its work wisely, no interference is possible. We hope we have seen the last expository statute under our constitution : all such are fundamentally vicious. This act, so far as expository, must fall, and its provisions fall with it.

We have discussed this question entirely on the provisions of our own constitution, and this saves us from the necessity of noticing the decisions of other states cited in the argument. They are irrelevant except as distant analogies. We notice the extreme and exceptional cases that are always cited in such arguments; but we do not discuss them, because they are admitted to be exceptional. We mean not to overrule them, because this is not necessary. As exceptional cases they must always be restricted by the maxim, *Quod contra rationem juris introductum est, non est producendum ad consequentias;* and this prevents their application here. We disclaim any attempt to distinguish them all from this case, because that is not needed until some case arises which resembles them, or some of them, more nearly than this one does; and because we desire to avoid mere *dicta* by which some might be misled. We notice the argument of the case, which proceeds upon original principles, independently of this expository legislation; but it does not convince us that we ought to change the views which we have heretofore expressed : 6 Casey 465; 2 Id. 269. We do not at all interfere with the savings principle of these associations, nor with the efficiency of the contracts in their legal effect when entered into. We simply declare that there is the same law for them as for other lenders of money, for all loans previous to the Act of 1859, and that they can recover in courts only the amount loaned on their mortgages, with legal interest thereon. The court below erred in allowing them to recover more.

Judgment reversed, and a new trial awarded.